1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

11
12

DENNIS GRIMES,
CDCR #V-90377,

Civil No.    06-2309 BTM (LSP)

13

Plaintiff,

14

vs.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.P. 56**

15
16

JAMES E. TILTON; A. FAVILA; S. JUAREZ; REVEREND STEVE FRANCIS; ALAN HERNANDEZ; GEORGE GIURBINO; V.M. ALMAGER;

**[Doc. No. 129-1]**

17
18

Defendants.

19

## I.

20

### STATEMENT OF THE CASE

21      Dennis Grimes ("Plaintiff"), a California state prisoner currently incarcerated at the

22  Tallahatchie County Correctional Facility located in Tutwiler, Mississippi, is proceeding pro se

23  and *in forma pauperis* with a Complaint filed pursuant to the Civil Rights Act, 42 U.S.C. § 1983.

24  Currently pending before the Court is Defendants' Motion for Summary Judgment pursuant to

25  FED.R.CIV.P. 56 [Doc. No. 129].

26  / / /

27  / / /

28  / / /

## II.

### PROCEDURAL BACKGROUND

On September 5, 2007, the Court granted in part and denied in part Defendants' Motion to Dismiss pursuant to FED.R.CIV.P. 12(b)(6).  Specifically, the Court: (1) dismissed Plaintiff's claims for monetary damages against Defendants in their official capacities as barred by the Eleventh Amendment; (2) denied Defendants' Motion to Dismiss Plaintiff's Complaint for failing to allege personal acts or omissions; (3) denied Defendants' Motion to Dismiss Plaintiff's equal protection claims; (4) denied Defendants' Motion to Dismiss Plaintiff's Eighth Amendment claims; and (5) denied Defendants' Motion to Dismiss Plaintiff's Complaint on qualified immunity grounds.  *See* Sept. 5, 2007 Order at 14-15.

Defendants filed their Answer [Doc. No. 63] and now move for summary judgment on the grounds that: (1) no genuine issues of material facts exist to show that Defendants violated Plaintiff's Eighth Amendment rights; (2) Defendants did not substantially burden Plaintiff's religious beliefs in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1 *et. seq*; (3) Plaintiff's claims for declaratory and injunctive relief are moot; and (4) Defendants are entitled to qualified immunity.

The Court has advised Plaintiff of his rights and obligations to oppose Defendants' Motion pursuant to *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988) and *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (en banc).[1]  Plaintiff filed his Opposition on September 24, 2008 and his Complaint is verified under penalty of perjury.  *See Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (holding that a complaint or motion duly verified under penalty of perjury pursuant to 28 U.S.C. § 1746 may be used as an opposing affidavit under FED.R.CIV.P. 56.).  Defendants filed their Reply on October 3, 2008.

/ / /

/ / /

---

[1]  *Klingele* and *Rand* together require the district court "'as a bare minimum, [to provide a pro se prisoner] with fair notice of the requirements of the summary judgment rule.'"  *Klingele*, 849 F.2d at 411 (quoting *Hudson v. Hardy*, 412 F.2d 1091, 1094 (D.C. Cir. 1968)).

06cv2309

Having now exercised its discretion to consider the matter as submitted on the papers without oral argument pursuant to S.D. CAL. CIVLR 7.1.d.1, the Court hereby GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment pursuant to FED.R.CIV.P. 56(c) for the reasons set forth in detail below.

### III.

#### FACTUAL BACKGROUND

**A.    Eighth Amendment Outdoor Exercise Claims**

Plaintiff claims that Defendants deprived him of outdoor exercise for a period of sixteen (16) weeks while he was incarcerated at Centinela State Prison ("CEN").  (*See* Compl. at 4.) Defendants indicate that the period of time Plaintiff was deprived of outdoor exercise was actually twenty one (21) weeks.  (*See* Defs.' Memo of Ps & As, Declaration of L. Shipman, Correctional Counselor II, Exhibit "N," Movement History of Plaintiff Dennis Grimes).  Both parties agree that Plaintiff was deprived of outdoor exercise from October 12, 2005 until March 7, 2006 with the exception of two days.

However, while Defendants concede that Plaintiff has shown a sufficiently long-term deprivation to satisfy the objective prong of an Eighth Amendment analysis, they have provided several documents to support their position that Plaintiff will be unable to satisfy the subjective prong.  These documents show that a race riot occurred between sixty one (61) Hispanic and African-American inmates on   July 17, 2005 which resulted in Defendants imposing a "lockdown" on Centinela's Facility "D." (Shipman Decl., Exhibit "A," Crime/Incident Report dated July 17, 2005.)  As a result, a "modified program" was implemented which is the "suspension of any operation or procedure to prevent, contain or control an institutional disturbance."  (Declaration of G. Giurbino, former Warden of Centinela State Prison, ¶ 5.) According to Giurbino, this modified program was implemented to allow staff to monitor the tensions between the Hispanic and African-American inmates and allow time to investigate the incident that led to the modified program.  (*Id.* at ¶¶ 8-9.)

/ / /

/ / /

When the modified programming was first implemented, most privileges were suspended including loss of recreational activities, phone calls, religious services and canteen privileges. (Giurbino Decl. ¶ 11.)  However, even while Facility "D" was on the modified program, racial incidents between the Hispanic and African American inmates continued to occur.  On July 21, 2005, prison officials authorized "MAC"[2] Representatives to go to the housing units in an attempt to alleviate the racial tension.  (*Id.* ¶ 12.)   While an African American MAC Representative was visiting a housing unit he was attacked by a Hispanic inmate.  (*Id.* ¶ 13.)  Soon thereafter, a Hispanic inmate stabbed his Caucasian cellmate.  (*Id.*)   Accordingly, the lockdown program was modified to include inmates of all ethnic groups.  (*Id.* ¶ 14.)

The next day, on July 22, 2005, an African American inmate attacked a correctional officer and a Hispanic inmate.  (*Id.* ¶ 15.)  In the following weeks, prison officials obtained information that Hispanic inmates were planning to attack African American inmates when the lockdown was lifted and that inmates of other races were being forced to choose sides between the Hispanic and African American inmates.  (*Id.*  ¶¶ 16-17.)

In an attempt to return to normal program, on August 5, 2005, prison officials lifted the lockdown as to all inmates other than Hispanic and African American inmates.  (*Id.* ¶ 18.) Staff investigation revealed the source of the riot that occurred on July 17, 2005 and attributed it to rising racial tensions between Hispanic and African American inmates.  However, staff began to "de-escalate the modified program" in order to "eventually return D Facility to normal programming" for all inmates.  (*Id.* ¶ 22.)  Even though prison officials believed that tensions were still high among Hispanic and African American inmates, they began to allow some privileges, including visits, on  August 13, 2005.  (*Id.* ¶¶ 22, 25.)

On August 19, 2005, an African American inmate "ran out of his cell and attacked two newly-arrived Hispanic inmates." (*Id.* ¶ 25.)  Despite this, prison officials continued to reinstate some privileges in August and September of 2005, including allowing visits and distributing

---

[2]  "MAC" inmates are those inmates that serve on the Men's Advisory Council.  CAL. CODE REGS., TIT. 15 § 3230 (a) provides, in part,  that "each warden shall establish an inmate advisory council which is representative of that facility's inmate ethnic groups."

packages.  (*Id.* ¶ 29.)  Staff continued to meet with the members of MAC for both the Hispanic and African American inmates but confirmed through interviews that the inmates did not consider the racial tensions to be over.  (*Id.* ¶ 30.)  In addition, staff continued to discover a number of inmate manufactured weapons while conducting routine searches.  (*Id.* ¶¶ 32-35.)

During October of 2005, privileges began to be reinstated including non-contact visits, canteen privileges, phone calls and some Hispanic and African American inmates were released to work programs.  (*Id.* ¶¶ 40-41.)   However, on October 24, 2005, prison officials discovered an "uncontrolled weapon near the handball courts."  (*Id.* ¶ 43.)  Despite this, prison officials "developed a modified recreational yard program" while still being aware of the issue that "even when tensions among inmates are not especially high, the yard can be a dangerous place." (*Id.* ¶ 44.)  The reinstatement of yard privileges began on October 25, 2005 and continued through November 8, 2005.  (*Id.* ¶ 45.)

Another riot between Hispanic and African American inmates on Facility "D" occurred on November 8, 2005.  (*Id.* ¶ 46.)  Once again, prison officials suspended all yard privileges. (*Id.*) Following the riot, a Hispanic MAC Representative who was permitted to tour the housing units in an attempt to diffuse the tensions, attacked two African American MAC Representatives. (*Id.* ¶ 47.)  In addition, staff discovered a note which they interpreted as an instruction to other "Hispanic inmates to assault African-American inmates whenever the opportunity presented itself."  (*Id.* ¶ 48.)

Correctional Counselors attempted to interview inmates on Facility "D" in order to "resolve the racial tension and de-escalate the modified program."  (*Id.* ¶ 51.)  On January 18, 2006, Hispanic and African American MAC representatives agreed to meet and confer.  (*Id.* ¶ 55.)  These inmates informed prison officials that both sides were "willing to program without further incident."  (*Id.* ¶ 55.)  Staff began to implement privileges such as phone use, canteen purchases, visits and package distribution.  (*Id.* ¶ 56.)  Beginning on February 28, 2006, a gradual reinstatement of yard privileges began and by March 6, 2006, yard privileges were authorized for the entire inmate population of Facility "D."  (*Id.* ¶ 59.)  Plaintiff alleges that his yard privileges were restored on March 7, 2006.  (*See* Compl. at 4.)

**B.     Religious Diet claims**

On November 20, 2005, Plaintiff wrote to the CEN Food Services Manager requesting a vegetarian diet in light of his "sincerely held religious beliefs." (*See* Compl. at 5, Exhibit "D.") Assistant Food Manager at Centinela, J.G. Corey, responded to Plaintiff's request on December 3, 2005 by informing Plaintiff that he must have the Facility Chaplain or a "Religious Representative" from his faith notify the Food Services Manager that Plaintiff is eligible to receive a religious diet pursuant to CAL. CODE REGS. TIT. 15 § 3054. (*Id.*, Exhibit "E," Memorandum from J.G. Corey to Plaintiff dated December 3, 2005.)

Plaintiff submitted an "Inmate Request for Interview" form to Defendant Francis, the Chaplain at Centinela on January 11, 2006. (*Id.*, Exhibit "F." Inmate Request for Interview dated Jan. 11, 2006.) In this request, Plaintiff wrote "I am a vegetarian due to my religious belief, can you please advise central kitchen/food manager to provide me with vegetarian meals due to my religious belief." (*Id.*) Plaintiff was interviewed by Defendant Francis on January 20, 2006. (*Id.*, Declaration of S. Francis, ¶¶ 5, 6.) Plaintiff alleges in his verified Complaint that he informed Defendant Francis that he considers himself to be a Christian and his own "sincerely held religious belief" interprets bible scripture to find that the "consumption of animal meat is sinful." (Compl. at 6.)

Defendant Francis declares that he informed Plaintiff that it was his opinion, as a Protestant Chaplain, that Christianity does not require a religious diet. (Francis. Decl. ¶ 6.) He states that he told Plaintiff "because he was not following the beliefs of a particular Christian sect whose religious beliefs required a vegetarian diet, [Francis] could not verify his need for such a diet and, therefore, he did not qualify for a religious diet." (*Id.* ¶ 10.) Accordingly, Plaintiff's request for a religious diet was denied by Defendant Francis on January 20, 2006. (Comp. at 6, Exhibit "E.")

Plaintiff filed an administrative grievance on January 22, 2006 appealing Defendant Francis' decision to deny him a vegetarian meal. (*See* Pl.'s Compl., Exhibit "G," Inmate/Parolee Appeal Form dated January 22, 2006, CEN Log. No. D-06-0078.) Plaintiff was, once again, interviewed by Defendant Francis on February 23, 2006. (*See* Pl.'s Compl, Exhibit "H," First

Level Appeal Response, CEN Log No. D-06-0078 dated March 1, 2006.)  During this meeting, both Plaintiff and Defendant Francis recall discussing RLUIPA and its implications on the issue of religious diets.  (*See* Compl. at 7; Francis Decl. ¶ 14.)  Defendant Francis told Plaintiff that he was bound by the current state of CAL. CODE REGS. TIT. 15 § 3054 which Francis believed required him to verify whether or not Plaintiff had a special religious dietary need by "contacting the religious organization to which the inmate claims to be an observant member."  (*Id.*)  In this instance, Plaintiff did not provide Defendant Francis with an identifiable "sect" of the Christian faith and thus, Francis was unable to "verify" Plaintiff's need for a religious diet.  (Francis Decl. ¶¶ 14, 15.)  Accordingly, at the First Level Appeal Response, Plaintiff's request for a religious diet was denied by Defendants Francis and Juarez because Plaintiff was unable to provide Defendant Francis with information to verify his request.  (*Id.*)

One day prior to the written denial by Defendants Francis and Juarez, a "Notice of Change to Department Operations Manual" was issued in which changes were made as to how the religious diet program was to be implemented.  (Shipman Decl., Exhibit "M," Department of Corrections and Rehabilitation Notice of Change to Department Operations Manual, Food Service, dated February 28, 2006.)  A few weeks later, the regulation which required a Chaplain to "verify" the need for a religious diet was modified to a less restrictive requirement requiring that the Chaplain need only "determine" a prisoner's need for a religious diet.  *See* CAL. CODE REGS. TIT. 15, § 3054 (effective April 24, 2006.)

Plaintiff informed Defendant Francis that he would refuse to eat any food that contained meat.  (Francis Decl. ¶ 8.)  After Plaintiff received the denial at the first level of review, he submitted an appeal to the next level along with a "signed affidavit to demonstrate the sincerity of his religious belief in vegetarianism."  (*Id.*, Exhibit "I," Affidavit of Religious diet signed and dated by Plaintiff on March 6, 2006.)  Defendant Warden Giurbino denied Plaintiff's appeal at the Second Level of Review on March 22, 2006 by finding that "[Plaintiff] has not presented additional information or documentation to support granting his request for a vegetarian diet." (Compl., Exhibit "J," Second Level Appeal Response, CEN Log No. D-06-0078, dated March 22, 2006.)  Plaintiff submitted his appeal to the final level of administrative review.  On May 20,

2006, N. Grannis, Chief of the Inmate Appeals Branch, notified Plaintiff that his grievance was being denied at the Director's Level, in part, because "a generic claim of requiring a vegetarian diet based upon religious beliefs is insufficient." (Pl.'s Comp., Ex. "K," Director's Level Appeal Decision, CEN Log. No. D-06-0078, dated May 30, 2006.) Plaintiff's request for a religious diet was ultimately granted in January of 2007. (Francis Decl. ¶ 23.)

## IV.

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is properly granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court shall consider all admissible affidavits and supplemental documents submitted on a motion for summary judgment. *See Connick v. Teachers Ins. & Annuity Ass'n*, 784 F.2d 1018, 1020 (9th Cir. 1986).

The moving party has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970). However, to avoid summary judgment, the nonmovant cannot rest solely on conclusory allegations. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Rather, he must present "specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The Court may not weigh evidence or make credibility determinations on a motion for summary judgment. Quite the opposite, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Id.* at 255; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The nonmovant's evidence need only be such that a "fair minded jury could return a verdict for [him] on the evidence presented." *Anderson*, 477 U.S. at 255. However, in determining whether the nonmovant has met his burden, the Court must consider the evidentiary burden imposed upon him by the applicable substantive law. *Id.*

1      A verified complaint or motion may be used as an opposing affidavit under FED.R.CIV.P.

2 56 to the extent it is based on personal knowledge and sets forth specific facts admissible in

3 evidence. *McElyea v. Babbitt*, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curiam) (complaint);

4 *Johnson v. Meltzer*, 134 F.3d 1393, 1399-1400 (9th Cir. 1998) (motion). To "verify" a

5 complaint, the plaintiff must swear or affirm that the facts in the complaint are true "under the

6 pains and penalties of perjury." *Schroeder v. McDonald*, 55 F.3d 454, 460 n.10 (9th Cir. 1995).

7     **B.**    **Eighth Amendment claim - Outdoor Exercise**

8      Defendants argue they are entitled to judgment as a matter of law pursuant to

9 FED.R.CIV.P. 56 because no triable issue of fact exists to show that they acted with deliberate

10 indifference to Plaintiff's health or safety. (Defs.' Ps & As at 5, *citing Farmer v. Brennan*, 511

11 U.S. 825, 837 (1994)).

12      "Whatever rights one may lose at the prison gates, ... the full protections of the eighth

13 amendment most certainly remain in force. The whole point of the amendment is to protect

14 persons convicted of crimes." *Spain v. Procunier*, 600 F.2d 189, 193-94 (9th Cir. 1979) (citation

15 omitted). The Eighth Amendment, however, is not a basis for broad prison reform. It requires

16 neither that prisons be comfortable nor that they provide every amenity that one might find

17 desirable. *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981); *Hoptowit v. Ray*, 682 F.2d 1237,

18 1246 (9th Cir. 1982). Rather, the Eighth Amendment proscribes the "unnecessary and wanton

19 infliction of pain," which includes those sanctions that are "so totally without penological

20 justification that it results in the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S.

21 153, 173, 183 (1976); *see also Farmer*, 511 U.S. at 834; *Rhodes*, 452 U.S. at 347. This includes

22 not only physical torture, but any punishment incompatible with "the evolving standards of

23 decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958);

24 *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

25      Although prison administrators generally have broad discretion in determining whether

26 to declare emergencies and impose "lockdowns" to control institutional disturbances, the

27 conditions imposed during the lockdown may constitute cruel and unusual punishment under the

28 Eighth Amendment. *See Hayward v. Procunier*, 629 F.2d 599, 603 (9th Cir. 1980) (denial of

06cv2309

1  outdoor exercise may give rise to Eighth Amendment violation even in response to emergency

2  conditions).  To assert an Eighth Amendment claim for deprivation of humane conditions of

3  confinement, a prisoner must satisfy two requirements: one objective and one subjective.

4  *Farmer*, 511 U.S. at 834; *Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir. 1994).

5       "Under the objective requirement, the prison official's acts or omissions must deprive an

6  inmate of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834.  This

7  objective component is satisfied so long as the institution "furnishes sentenced prisoners with

8  adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Hoptowit*, 682

9  F.2d at 1246; *Farmer*, 511 U.S. at 833; *Wright v. Rushen*, 642 F.2d 1129, 1132-33 (9th Cir.

10  1981).

11       The subjective requirement, relating to the defendants' state of mind, requires "deliberate

12  indifference." *Allen*, 48 F.3d at 1087.  "Deliberate indifference" exists when a prison official

13  "knows of and disregards an excessive risk to inmate health and safety; the official must be both

14  aware of facts from which the inference could be drawn that a substantial risk of serious harm

15  exists, and he must also draw the inference." *Farmer*, 511 U.S. at 835.

16       Defendants concede that Plaintiff has met the objective requirement to invoke the Eighth

17  Amendment but argue that he cannot supply evidence to support his claim under the subjective

18  requirement.  (*See* Defs.' Ps & As at 6.)   In order to avoid summary judgment, Plaintiff must

19  also show there are triable issues as to the Eighth Amendment's subjective requirement.

20  *Farmer*, 511 U.S. at 834.  In this regard, the Court finds no evidence in the record to support

21  Plaintiff's claim that the denial of outdoor exercise, which began due to racial tension and

22  violence was the result of Defendants' "deliberate indifference." *Farmer*, 511 U.S. at 835;

23  *Lopez*, 203 F.3d at 1133.

24       The evidence as set forth above shows that the suspension of outdoor exercise began after

25  racial tensions in Facility D erupted on July 17, 2005; on that day a riot involving approximately

26  sixty one (61) Hispanic and African American inmates occurred. (Shipman Decl., Exhibit "A,"

27  Crime/Incident Report dated July 17, 2005.)  Several inmates sustained serious injuries.  (*Id.*)

28  Giurbino instituted a modified program schedule for Facility D the following day.  (Giurbino

Decl. ¶ 5.)  These restrictions were necessary in light of the racial violence and tension because time was needed to "resolve the tension to allow for the safe reintegration of the inmate population and the eventual return back to normal programming." (*Id.* ¶ 10.)

Giurbino has also submitted evidence to show that the racial tension and acts of inmate violence occurred even while the  modified programming was in place. (*Id.* ¶ 12.) Over the next several months following the July riot, each attempt to lift programming restrictions and re-integrate the African-American and Hispanic inmates was met with further violence. (*Id.* ¶ 69.) The declarations submitted by Defendants detail a number of incidents in which inmates were found to possess weapons, several serious inmate-on-inmate batteries and yet another race riot on November 8, 2005. Plaintiff has provided no evidence in the record to rebut this testimony of events.

Thus, the record is replete with facts which reveal that restrictions on outdoor exercise were instituted for the primary purpose of preventing further race-based attacks and injuries. In addition, Warden Giurbino claims, and all documentary evidence offered by both Plaintiff, as well as Defendants, show that the restrictions in Facility D were designed and continually modified in an effort to "alleviate the continued racial tension and to protect the safety of the affected inmates." (*Id.*) Moreover, Defendants believed that the modified programming was necessary because "the violence stemmed from racial tension" and even "new African-American and Hispanic inmates who transferred into the Facility and were not part of the July 17, 2005 riot, such as Plaintiff Dennis Grimes, were potentially in danger." (*Id.* ¶ 71.)

There is simply no evidence before this Court which supports Plaintiff's claims that any of the Defendants' actions were the product of any "deliberate indifference" on their part. *Farmer*, 511 U.S. at 837. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's Eighth Amendment claims.

/ / /

/ / /

/ / /

/ / /

C.     **RLUIPA Claims**

Defendants content that they are entitled to Summary Judgment as to Plaintiff's claims that his religious beliefs were substantially burdened in violation of RLUIPA.  (Defs.' Mot. Ps & As at 19.)

Specifically, RLUIPA provides:

> No government shall impose a *substantial burden on the religious exercise* of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person – [¶] (1) is in furtherance of a *compelling governmental interest*; and [¶] (2) is the *least restrictive means* of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a) (emphasis added). *See also San Jose Christian College v. Morgan Hill*, 360 F.3d 1024, 1033-34 (9th Cir. 2004) ("RLUIPA 'replaces the void provisions of RFRA' . . . and prohibits the government from imposing 'substantial burdens' on 'religious exercise' unless there exists a compelling governmental interest and the burden is the least restrictive means of satisfying the governmental interest.").

RLUIPA defines religious exercise to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); *San Jose Christian College*, 360 F.3d at 1034.  *See also Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760 (7th Cir. 2003) (noting that "[t]his definition reveals Congress's intent to expand the concept of religious exercise contemplated both in decisions discussing the precursory RFRA [. . . .] and in traditional First Amendment jurisprudence."), *cert. denied,* 124 S.Ct. 2816 (2004).

While RLUIPA does not define what constitutes a "substantial burden" on religious exercise, the Ninth Circuit has defined the term according to its plain language.  In *San Jose Christian College*, 360 F.3d at 1034, the Court looked to the "ordinary, contemporary, common meaning," to define the term. *Id.*  The Court resorted to dictionary definitions describing a "burden" as "something that is oppressive," and "substantial" as "'considerable in quantity' or 'significantly great.'"  *Id.*  Thus, a substantial burden on religious exercise must impose a "significantly great restriction or onus upon such exercise." *Id.*

The party alleging a RLUIPA violation carries the initial burden of demonstrating that a governmental practice constitutes a substantial burden on his religious exercise. *See* 42 U.S.C. §§ 2000cc-1(a); 2000cc-2(b) ("[T]he plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion."). Accordingly, only if Plaintiff successfully demonstrates that the CDCR's practice imposes a substantial burden on his exercise of his religion, does the burden shift to Defendants to demonstrate that their policy is designed to further a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. §§ 2000cc-1(a)(1), (2). Thus, the question is whether Plaintiff's religious beliefs were substantially burdened by the Defendants' denial of a vegetarian diet. *See Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005) (finding that burden on religious exercise is "substantial" when the state "'denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.'") (quoting *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981)).

Here, Plaintiff claims that the denial of a vegetarian diet imposes a substantial burden on the exercise of his religious beliefs because he was forced to choose between following his religious beliefs or eating meat so that he could maintain a diet with proper nutrition. (Pl.'s Decl. at 2.) In addition, he claims that he was "essentially forced by hunger to eat meat in violation of his religious dietary beliefs." (Pl.'s Opp'n at 7-8.) Defendants argue that although Plaintiff "did not have an officially sanctioned vegetarian diet from January 2006 through January 2007, the lack of an officially sanctioned vegetarian diet did not substantially burden his religious beliefs." (Defs.' Ps & As at 20.) In support of this argument, Defendants contend that meat did not make up a majority of the meals and Plaintiff was able to supplement with canteen items, as well as items sent to him by his family. (*Id.*)

The Court finds that genuine issues of material fact exist as to whether Defendants' denial of a vegetarian diet substantially burdened his rights under RLUIPA. *See Shakur v. Schriro*, 514 F.3d 878, 889 (9th Cir. 2008). Once there is determined to be an issue with regard to whether

1   or not Plaintiff's exercise of his religion was substantially burdened by the Defendants' action,

2   the "government bears the burden of establishing that the regulation serves a compelling

3   government interest and is the least restrictive means of achieving that interest." *Id*. Defendants

4   fail to make any argument with respect to this burden of demonstrating a compelling government

5   interest in denying Plaintiff a religious diet.   Accordingly, the Court **DENIES** Defendants

6   Favila, Juarez and Francis' Motion for Summary Judgment as to Plaintiff's RLUIPA claims

7   pursuant to FED.R.CIV.P. 56.[3]

8               **D.       Fourteenth Amendment Equal Protection claims**

9           Defendants also seek summary judgment of Plaintiff's claims that Defendants violated

10   the Fourteenth Amendment's Equal Protection Clause by providing vegetarian diets to Muslim

11   and Buddhist inmates, while denying these diets to Christian inmates such as Plaintiff.  (Defs.'

12   Ps & As at 15, 18.)  The "Equal Protection Clause of the Fourteenth Amendment commands that

13   no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which

14   is essentially a direction that all persons similarly situated should be treated alike."  *City of*

15   *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985); *Shaw v. Reno*, 509 U.S. 630

16   (1993).   The Equal Protection Clause "entitles each prisoner to a 'reasonable opportunity of

17   pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to

18   conventional religious precepts.'" *Shakur*, 514 F.3d at 891 (quoting *Cruz v. Beto*, 405 U.S. 319,

19   322 (1972)).

20           Accordingly, the Ninth Circuit has held that the four-part test found in the United States

21   Supreme Court decision in *Turner v. Safely*, 482 U.S. 78 (1987) applies to equal protection

22   claims. *Shakur*, 514 F.3d at 891. "When a prison regulation impinges on inmates' constitutional

23   rights, the regulation is valid if it is reasonably related to legitimate penological interests."

24   *Turner*, 482 U.S. at 89.  The Supreme Court set out four factors in *Turner* that must be weighed

25

26       [3]  In their moving papers, Defendants seek qualified immunity on Plaintiff's religious exercise
    claims.  However, they have not set forth any argument with regard to whether they are entitled to
27   summary judgment or qualified immunity with regard to Plaintiff's First Amendment free exercise
    claims.  The First Amendment claims and RLUIPA claims are two separate causes of action yet
28   Defendants never attack the merit of Plaintiff's First Amendment claim.   Thus, Plaintiff's First
    Amendment claims remain in this action.

when determining whether a prison regulation is reasonably related to legitimate penological interests.  The relevant factors in determining whether a regulation, or its application in a particular situation, is reasonable are:  (1) whether there is a valid, rational connection between the regulation and a legitimate and neutral government interest, (2) whether there are alternative means of exercising the constitutional right, (3) the impact the accommodation of the right will have on prison staff and other prisoners, and (4) whether the regulation is an exaggerated response to prison concerns, in light of readily available alternatives. *Turner*, 482 U.S. at 89-90.

Here, the Court is unable to undergo an analysis of all the *Turner* factors because the Defendants failed to develop the record.  Defendants have not even attempted to show that their treatment of Plaintiff, as a Christian inmate, and their treatment of Muslim and Buddhist inmates is reasonably related to a legitimate penological interest.  Defendants simply argue that they relied on a regulation in denying Plaintiff's request.  They must do more.  They must show how this regulation is reasonably related to a legitimate penological interest.  Aside from relying on what the regulation actually required, Defendants have not demonstrated to the Court what impact, if any, giving the vegetarian meal to Plaintiff would have on prison staff or the other inmates.  Most importantly perhaps, Defendants have failed to identify the legitimate penological interest in denying Plaintiff's request for a vegetarian meal.

Accordingly, Defendants Francis, Favila and Juarez' Motion for Summary Judgment on Plaintiff's Fourteenth Amendment Equal Protection claims is **DENIED**.

### E.    Personal Liability

#### 1.    Warden Giurbino

All the claims against former Warden Giurbino arise from the allegations that he denied Plaintiff's request for a vegetarian diet based on his religious beliefs and Giurbino granted another inmate's request for a religious diet.  Plaintiff seeks to hold Defendant Giurbino liable in this action because he allegedly signed the second level of review denying Plaintiff's inmate appeal on March 22, 2006.  (*See* Shipman Decl., Exhibit "K," Memorandum dated March 22, 2008, Second Level Appeal Response, CEN Log No. D-06-0078.)  It is purportedly signed by Defendant Giurbino.  However, Defendant Giurbino has submitted a declaration in which he

indicates that this is not his signature and it is likely the signature of Acting Chief Deputy Warden Armando Favila. (Giurbino Decl. ¶ 81.) This belief is based on Giurbino's declaration that he delegated the responsibility of reviewing and responding to 602 inmate appeals to the second level of review to the Chief Deputy Warden. (*Id.* ¶ 80). Thus, Giurbino declares that he "did not personally review Plaintiff's CDC form 602 appeal, nor did I personally deny his CDC 602 appeal requesting a religious diet." (*Id.* ¶ 82.) In fact, Defendant Avila does admit that he signed the second level grievance response dated March 22, 2008. (*See* Declaration of A. Favila, ¶ 9.) Plaintiff offers no evidence to show that Defendant Giurbino was aware of, or directed, the denial of his request for a religious diet.

Second, Plaintiff seeks to hold Defendant Giurbino liable because he overruled Defendant Francis' denial with regard to another inmate's request for a religious diet but failed to do so for him. Defendant Giurbino does admit that he did respond to a request by Inmate Jewell to overturn Defendant Francis' decision to deny his religious diet. (Giurbino Decl. ¶¶ 84-86.) Giurbino declares that he did so in this case because the inmate had sent a letter directly to him and he received no such communication directly from Plaintiff. (*Id.*) He further declares that he only learned of Plaintiff's request after Giurbino left the Warden position at Centinela and became the Associate Director of High Security and Transitional Housing. (*Id.* ¶ 87.) Again, Plaintiff offers no evidence to show that he ever attempted to bring these issues directly to Defendant Giurbino nor does he offer any evidence to show that Defendant Giurbino was ever personally aware of Plaintiff's situation. Defendant Giurbino has met his burden to show that he had no personal involvement in the decision to deny Plaintiff's request for a religious diet.

### 2.   Defendant Tilton

In addition, Plaintiff seeks to hold Defendant Tilton, the former Secretary of the CDCR, liable for violating his rights under the First Amendment and RLUIPA for the "promulgation and allowed continuance of Title 15, Cal. Code of Regulations, Section 3054" which was the basis for the denial of Plaintiff's request for a religious diet. Defendant Tilton maintains that he was named Acting Secretary of the CDCR on April 20, 2006, after Defendants denied Plaintiff's request for a religious diet. (Declaration of J. Tilton ¶¶ 9, 12.) Defendant Tilton, declares under

penalty of perjury that he "had no involvement in promulgating the version of section 3054, which was effective from October 12, 1995, through April 23, 2006, that prison officials applied to Plaintiff in denying his request for a religious diet." (*Id.* ¶ 14.) Moreover, he declares that the amendment to the declaration was already initiated by the prior Secretary of the CDCR when he assumed the role of Acting Secretary on April 20, 2006, four days before the amendment to the regulation took effect. (*Id.* ¶ 15.) Plaintiff offers no evidence to dispute Tilton's claims.

These allegations without more, fail to show the individual liability required to support a constitutional claim under § 1983. *See Palmer v. Sanderson*, 9 F.3d 1433, 1437-38 (9th Cir. 1993) (noting there is no respondeat superior liability under 42 U.S.C. § 1983); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (to state a claim against a state official under section 1983, the plaintiff must allege direct personal participation by each defendant). A supervisor is only liable for the constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and with deliberate indifference, failed to act to prevent them. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Taylor*, 880 F.2d at 1045.

Plaintiff sets forth no evidence or additional facts to show that either Giurbino or Tilton participated or in any way directed his subordinates to cause a violation of Plaintiff's constitutional rights. *See Sanders v. Kennedy*, 794 F.2d 478, 483 (9th Cir. 1986) (to avoid the respondeat superior bar, the plaintiff must allege personal acts by each defendant which have a direct causal connection to the constitutional violation at issue); *see also Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). "Causation is, of course, a required element of a § 1983 claim." *Estate of Brooks v. United States*, 197 F.3d 1245, 1248 (9th Cir. 1999).

Accordingly, the Court **GRANTS** Defendants Tilton and Giurbino's  Motion for Summary Judgment  as to all of Plaintiff's claims found in his Complaint.

### F.    Injunctive Relief Claims

Defendants also seek summary judgment of Plaintiff's claims for injunctive relief. (Defs.' Ps & As at 21-22.) Plaintiff was previously housed at Centinela and Corcoran but he has since been transferred to the Tallahatchie County Correctional Facility.  However, Plaintiff remains an inmate who falls under the jurisdiction of the California Department of Corrections

06cv2309

and Rehabilitation ("CDCR").  (*See* Declaration of J. Crawford ¶¶ 4, 5).  It is undisputed that Plaintiff is now a participant of the religious diet program as governed by Title 15 of the California Code of Regulations.  (*Id.* ¶ 7; Pl.'s Opp'n at 9.)   Requests for injunctive relief are rendered moot when an inmate is transferred to a different facility.  *Johnson v. Moore*, 948 F.2d 517 (9th Cir. 1991).  As this Court informed Plaintiff previously, should there be a lapse in receiving the religious diet, these claims would be against parties that are not currently involved in this action.  (*See* Feb. 5, 2008 Order Denying Plaintiff's Motion for Preliminary Injunction at 3.)

Defendants' Motion for Summary Judgment as to Plaintiff's claims for injunctive relief is **GRANTED** as these claims are now moot.

### G.      Qualified Immunity

Defendants seek summary judgment of Plaintiff's First Amendment and RLUIPA claims on the grounds of qualified immunity.  (*See* Defs.' Ps & As at 2.)  However, as set forth above, Defendants offer no argument in support of their motion for summary judgment of Plaintiff's First Amendment free exercise claims.  Thus, the Court will address qualified immunity only as it relates to Plaintiff's RLUIPA claims.

#### 1.      Standard of Review

The entitlement to qualified immunity "is an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  The defense of "qualified immunity" protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  This standard "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)); *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001); *Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.").

18

The required first step in a qualified immunity analysis "is to consider the materials submitted in support of, and in opposition to, summary judgment, in order to decide whether a constitutional right would be violated if all facts are viewed in favor of the party opposing summary judgment." *Jeffers*, 267 F.3d at 909 (citing *Saucier*, 533 U.S. at 201). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201; *Haynie v. County of Los Angeles*, 339 F.3d 1071, 1078 (9th Cir. 2003).

### 2. "Prong" One - Constitutional Violation

Under *Saucier*, the Court must first ask itself "based upon the facts taken in the light most favorable to the party asserting the injury, did the officer's conduct violate a constitutional right?" *Jackson v. City of Bremerton*, 268 F.3d 646, 650 (9th cir. 2001) (citing *Saucier*, 533 U.S. at 201); *Johnson v. County of Los Angeles*, 340 F.3d 787, 791 (9th Cir. 2003) (noting that because qualified immunity is "'an entitlement not to stand trial' . . . courts, not juries, [must] settle the ultimate questions of qualified immunity") (quoting *Mitchell,* 472 U.S. at 526). As discussed above, the Court has determined, in viewing the facts in the light most favorable to Plaintiff, that there is a triable issue of material fact whether Defendants violated Plaintiff's rights under RLUIPA. Accordingly, the Court will turn to the next "prong" of the qualified immunity analysis.

### 3. "Prong 2" – Clearly Established

Because the Court has found there to be a potential RLUIPA violation, "the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201. The "salient question" is whether the state of the law at the time gives officials "fair warning" that their conduct is unconstitutional. *Hope*, 536 U.S.730, 740 (2002). The relevant inquiry must focus on "what the officer reasonably understood his powers and responsibilities to be, when he acted, under clearly established standards." *Saucier*, 533 U.S. at 208.

Plaintiff's claims with regard to his religious diet requests first arose towards the end of 2005. (Pl.'s Compl. at 5-9.) He continued to follow through with administrative grievances challenging the denial of a religious diet and had two interviews with Defendant Francis in

1  January and February of 2006.  (Francis Decl. ¶¶ 5, 14.)  During this time, Defendant Francis

2  relied on the prison's regulation in effect at the time that required "verification" of Plaintiff's

3  religious beliefs.  (*Id.* ¶¶ 7-11.)  Plaintiff maintains, and Defendant Francis does not dispute, that

4  he informed Defendant Francis that his reliance on the former CDCR regulation could violate

5  his rights under RLUIPA.  (Pl.s' Compl. at 8; Francis Decl. ¶ 14.)

6      On June 29, 2005, several months before Plaintiff first initiated his request for a religious

7  diet, the Ninth Circuit decided a case involving the impact of the CDCR's grooming regulations

8  on an inmate's religious beliefs as it pertained to RLUIPA.  *See Warsoldier*, 418 F.3d 989.  In

9  *Warsoldier*, the Ninth Circuit held that if a prisoner is challenging a regulation as a violation of

10  their rights under RLUIPA, the prison officials must actually have "considered and rejected the

11  efficacy of less restrictive measures before adopting the challenged practice."  *Id.* at 999.

12      Here, Defendants admit that they were aware of RLUIPA when they denied Plaintiff's

13  request.  (Francis Decl. ¶ 14.)  Moreover, *Warsoldier* was decided several months prior to

14  Plaintiff's request for a religious diet.  Defendants offer no argument as to whether or not they

15  considered any less restrictive measures when they denied Plaintiff's request.  While *Warsoldier*

16  arguably dealt with a grooming regulation, it also applied RLUIPA's standards to any prison

17  regulation that could "infringe on an inmate's practice of his religion."  *Warsoldier*, 418 F.3d

18  at 999.  Defendants have not made any argument with regard to whether the regulation at issue

19  served a compelling government interest.

20      Based on the state of the law at the time Plaintiff was denied a religious diet, and

21  Defendants' admission that they were aware of RLUIPA, the Court finds that a reasonable

22  officer would have known that the denial of a religious diet violated Plaintiff's rights under

23  RLUIPA.  Accordingly, Defendants' Motion for Summary Judgment on qualified immunity

24  grounds is **DENIED.**

25  / / /

26  / / /

27  / / /

28  / / /

# V.

## CONCLUSION AND ORDER

For all the reasons set forth above, the Court hereby:

(1)     **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's Eighth Amendment claims against all Defendants pursuant to FED.R.CIV.P. 56;

(2)     **DENIES** Defendants Francis, Favila and Juarez's Motion for Summary Judgment as to Plaintiff's RLUIPA claims pursuant to FED.R.CIV.P. 56;

(3)     **DENIES** Defendants Francis, Favila and Juarez's Motion for Summary Judgment as to Plaintiff's Fourteenth Amendment equal protection claims pursuant to FED.R.CIV.P. 56;

(4)     **GRANTS** Defendants Giurbino and Tilton's Motion for Summary Judgment as to all of Plaintiff's claims against them pursuant to FED.R.CIV.P. 56;

(5)     **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's claims for injunctive relief; and

(6)     **DENIES** Defendants' Motion for Summary Judgment on qualified immunity grounds.

(7)     Because there are no remaining claims against Defendants Hernandez, Almager, Giurbino and Tilton, and there is no just reason for delay, the Clerk of Court is directed to enter a final judgment as to Defendants Hernandez, Almager, Giurbino and Tilton pursuant to FED.R.CIV.P. 54(b).

**IT IS SO ORDERED.**

DATED:  March 11, 2009

Honorable Barry Ted Moskowitz
United States District Judge

06cv2309